ELMWOOD LIQUID PRODUCTS, INC.,
et al., Plaintiffs,

v.

SINGLETON PACKING CORPORATION
et al., Defendants.

No. 69–132 Civ.–T.

United States District Court,
M. D. Florida,
Tampa Division.

May 3, 1971.

Wagner, Cunningham & Vaughan, Tampa, Fla., Brufsky, Staas, Breiner & Halsey, Washington, D. C., for plaintiffs.

J. Danforth Browne, of Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., and Paul T. O'Neil, Shanley & O'Neil, Washington, D. C., for Charles F. Clark.

FINDINGS AND CONCLUSIONS

WILLSON, Senior District Judge.

The complaint in this case consists of three counts. Count I charged the defendants with patent infringement and Counts II and III charged defendant Air Products and Chemicals, Inc. (Air Products) with unfair competition. Jurisdiction is averred under Title 35 U.S. Code and 28 U.S.Code 1338 and was conceded at the pretrial.

The case came on for trial non-jury on Count I, the issue being the validity of Patent No. 3,238,736 issued to H. K. Macintosh on March 8, 1966 (Macintosh Patent), from Patent Application Serial No. 280,781 filed in the United States Patent Office on May 16, 1963. As Trial Judge, it was and is my opinion that the determination of the validity issue against plaintiffs is depositive of this civil action with finality. Under these circumstances, it was directed and counsel agreed to present all their evidence on this issue (Pre-Trial Conference; Tr. 125; 507–8; 548). During the course of a five-day trial, both sides presented various witnesses and submitted in evidence various written exhibits by way of drawings, letters, memoranda, deposi-

tions, and other documents and writings. At the conclusion of the trial, I orally stated for the record that judgment would be entered for the defendants and a judgment was entered on March 11, 1971. Defendants were granted leave for filing requests for precise and detailed findings of fact and conclusions of law within 30 days.

## FINDINGS OF FACT

### The Parties

1. Plaintiff American Export Industries, Inc. owns and controls the other plaintiffs. Plaintiff Elmwood Liquid Products, Inc. is the alleged owner of Macintosh Patent No. 3,238,736 (Macintosh Patent) and the plaintiff Reliquifier Corporation of America (Reliquifier) has an exclusive license under the Macintosh Patent. All of the plaintiffs are located at the same address, 26 Broadway, New York, New York (Pre-Trial Order, pp. 1, 2).

2. Defendant Air Products manufactures and leases or sells liquid nitrogen freezing tunnels under the trademark CRYO-QUICK® to customers located throughout the United States including defendant Singleton Packing Corporation located within this District (Pre-Trial Order, p. 2).

### Freezing Food By The Use Of Liquid Nitrogen

3. Nitrogen gas, which makes up about 79% of the atmosphere, is normally in gaseous state; however, when liquefied, nitrogen is at an extremely low temperature, about −320°F. at atmospheric pressure (Gaumer, Tr. 380–81; 437).

4. When heat is added to liquid nitrogen (or cold removed from liquid nitrogen), liquid nitrogen vaporizes and returns to its gaseous state (nitrogen vapor). The nitrogen vapor thus formed is also at an extremely low temperature, about −320°F., and additional heat must be added (or cold removed) to warm the nitrogen vapor to normal atmospheric temperature such as 70°F., for example

(Ebert Tr. 57; Thomas Tr. 326; Gaumer Tr. 435–36).

5. Thus, liquid nitrogen is a source of cold (refrigeration) useable for freezing food as also is the cold nitrogen vapor produced when the liquid nitrogen changes to the gaseous state (Gaumer Tr. 435–36).

6. The possibility of using liquid nitrogen for freezing food was recognized at an early time. United States Hill Patent No. 2,447,249 (Hill Patent) (DX–D, Tab 16) issued in 1948 discloses the use of liquid air (21% oxygen–79% nitrogen) for freezing food as well as other "liquid refrigerants which possess the physical property of liquefying at extremely low temperatures and passing in a gaseous state while still at a low temperature" (Column 5, lines 30–33), i. e., the characteristics of liquid nitrogen.

7. Atmospheric air can be separated into the oxygen and nitrogen by low temperature fractional distillation (air separation plant) (Gaumer Tr. 437).

8. During the early 60's oxygen came into great demand for steel making and the production of this oxygen gave nitrogen as a by-product (Thomas Tr. 310–11; Gaumer Tr. 436–37).

9. The industry at least by the early 60's was attempting to find uses for the nitrogen by-product of the air separation plants. One such use, involving the refrigeration and freezing of food by the use of liquid nitrogen, was considered by a number of different companies at about the same time (Moran Tr. 267; Thomas Tr. 310–11; Gaumer Tr. 436–37; Sills Tr. 442; Phillips Tr. 517).

10. In the early 60's, the Linde Company Division of Union Carbide (USA), a supplier of oxygen, was working with Sara Lee Bakery of Chicago on equipment for freezing food by the use of liquid nitrogen and had developed a truck refrigeration system using liquid nitrogen (Phillips Tr. 512–19).

11. In the early 60's Air Reduction was working on systems for freezing food with liquid nitrogen and eventually placed a liquid nitrogen food freezing

tunnel on the market in cooperation with Jan-Phyl Company located in Winter Haven, Florida (Moran Tr. 264–72).

12. The British Oxygen Company Limited had done work using liquid nitrogen for food freezing at least by mid-1957 (DX–D, Tab 1).

13. During the early 60's, Air Products, also in the business of supplying oxygen, was working on developments for the use of liquid nitrogen in the food industry (Pre-Trial Order, p. 10; PX–74; DX–F; DX–H).

14. Edward J. Kelly, while employed at Air Products, presented a paper (Kelly Paper) relating to the use of liquid nitrogen in the food industry at a seminar conducted at North Carolina State College, Raleigh, North Carolina, on June 14, 1962 (DX–O, pp. 28–31).

15. The Kelly Paper disclosed several ways in which liquid nitrogen could be used in connection with conventional mechanical food freezing apparatus and also systems for freezing food with the use of liquid nitrogen alone and also for refrigerating food (DX–F; DX–H).

16. In the early 60's, Seng of Air Products designed a food freezing apparatus employing liquid nitrogen (DX–P, p. 5; PX–74).

### The Macintosh Patent

*Disclosure of the Macintosh Patent*

17. The Macintosh Patent discloses a liquid nitrogen freezing system for quick freezing of perishables (Brufsky Tr. 2).

18. The system of the Macintosh Patent includes an elongated, open-ended tunnel having a conveyor in the tunnel for transporting perishables through the tunnel; the perishables enter the tunnel through one of the open ends (open inlet) and leave the tunnel through the other of the open ends (open outlet) (Brufsky Tr. 2; Ebert Tr. 55).

19. The Macintosh system includes a spray header located in the tunnel adjacent the open outlet end of the tunnel for spraying liquid nitrogen onto perishables passing beneath the spray header, the heat in the perishables causing the liquid nitrogen to vaporize and form cold nitrogen gas (Brufsky Tr. 2, 5).

20. The Macintosh system includes an exhaust fan located outside the tunnel having a suction inlet communicating to within the tunnel adjacent the open inlet end of the tunnel and an exhaust outlet communicating to outside the tunnel. The exhaust fan sucks cold nitrogen gas through the tunnel in countercurrent heat exchange relation with the perishables moving toward the liquid nitrogen spray header to progressively pre-cool the perishables (Brufsky Tr. 2, 3–5; Gaumer Tr. 373–74).

*Prosecution History of the Macintosh Patent*

21. The Macintosh patent application, as filed, included apparatus and method claims (PX–175, pp. 9–11).

22. The Patent Office Examiner refused to allow any claims, apparatus or method (PX–175, pp. 73–75).

23. The Patent Office Examiner relied upon the Hill Patent and held that it would be obvious to use a fan for controlling the movement of vapor through the tunnel of the Hill apparatus (PX–175, p. 74).

24. Macintosh took an appeal to the Patent Office Board of Appeals from the Examiner's refusal to allow any claims (PX–175, pp. 80–100).

25. The Patent Office Board of Appeals affirmed the Examiner's rejection of the apparatus claims adopting the Examiner's position with regard to the Hill Patent (PX–175, p. 121).

26. The Patent Office Board of Appeals found that Macintosh disclosed a specific problem in the freezing of food with liquid nitrogen and a solution to such problem not disclosed in the Hill Patent and allowed the method claims (PX–175, pp. 114–16).

27. Macintosh elected not to take an appeal from the Patent Office Board of Appeals' decision denying the apparatus claims and canceled the apparatus claims (PX–175, pp. 123–24).

28. Subsequently, on March 8, 1966, the Macintosh Patent issued with two (2) method claims essentially of the type allowed by the Patent Office Board of Appeals.

*The Claims of the Macintosh Patent*

29. The claims of the Macintosh Patent cover a method of freezing perishables whose bodies are susceptible to physical injury when subjected to liquid nitrogen.

30. The claims of the Macintosh Patent include three essential steps (a), (b) and (c).

31. Step (a) merely requires that the perishables to be frozen are advanced through an elongated tunnel from an open inlet to an open outlet.

32. Step (b) requires that the perishables positioned in the tunnel adjacent the outlet of the tunnel are subjected to liquid nitrogen to effect freezing of the perishables and to cause the liquid nitrogen to vaporize and form a cold gas.

33. Step (c) requires that substantially all of the cold gas be forced toward the inlet of the tunnel in countercurrent heat exchange relationship with the perishables to progressively precool the perishables to an extent preventing the perishables from being subjected to a physically injurious change in temperature when exposed to the liquid nitrogen.

34. Step (c) requires the obtaining of two results; (i) to derive maximum benefit from the liquid and gaseous nitrogen and (ii) to avoid an abrupt transition in the internal temperature of the perishables.

35. Method claim 2 of the Macintosh Patent is identical to claim 1 and further limited in that the tunnel is of substantially uniform cross-section throughout its length.

*The Macintosh Patent Is Invalid*

*The Subject Matter Disclosed and Claimed in the Macintosh Patent is not Original with Macintosh (35 U.S.C. § 102(f))*

36. At least by early 1962, Mealmaster Systems, Inc. (Mealmaster), a division of Cara Operations Limited located at Toronto, Canada, had a Liquefreeze machine installed at its premises for the purpose of freezing food such as T.V. dinners. A large liquid nitrogen storage tank had been installed at the premises of Mealmaster and liquid nitrogen was supplied to Mealmaster by Union Carbide of Canada (Macintosh Tr. 138–39; 144–45; Sills Tr. 442–43; 452; Phillips Tr. 520).

37. The Liquefreeze machine was found to be unsatisfactory. Since Mealmaster was interested in finding a commercially acceptable solution, Hamish K. Macintosh (Macintosh) took on responsibility for solving that problem (Macintosh Tr. 145–47, 150).

38. Macintosh approached Union Carbide of Canada and asked for assistance (Macintosh Tr. 151, 156).

39. John W. Ross (Ross) of Union Carbide of Canada contacted the Research Laboratories of the Linde Company Division of Union Carbide (USA), located at Tonawanda, New York, for assistance (Sills Tr. 444; Smith Tr. 469–70; Phillips Tr. 520–21).

40. As a consequence of Ross' request, Harry H. Phillips (Phillips) and Les S. Smith (Smith), then employed by the Linde Company Division, Union Carbide (USA), at the Research Laboratories, Tonawanda, New York, visited Toronto, Canada, on October 9, 1962, and had a meeting with Macintosh and Ross on the problem faced by Mealmaster (Smith Tr. 469–70; Phillips Tr. 513, 520–21).

41. Prior to the Toronto meeting on October 9, 1962, Phillips had acquired extensive knowledge on the freezing of food with liquid nitrogen as a consequence of his work at the Research Laboratories, Linde Company Division, Union Carbide (USA), Tonawanda, New York (Phillips Tr. 514–19).

42. Phillips' prior work included a development program with Sara Lee Bakeries (Sara Lee) in Chicago, Illinois, on a liquid nitrogen tunnel type of freez-

er for freezing bakery goods (Phillips Tr. 514–15).

43. The freezer being developed for Sara Lee employed immersion of the food into a bath of liquid nitrogen (Phillips Tr. 514).

44. At the time of his work with Sara Lee, Phillips had knowledge of the problem of food cracking when subjected to liquid nitrogen unless the food had been previously precooled (Phillips Tr. 528).

45. Phillips' work prior to the meeting of October 9, 1962, also included research, design and development of a liquid nitrogen truck refrigeration system sold by the Linde Company Division, Union Carbide (USA) under the trademark POLARSTREAM® (Phillips Tr. 514, 518).

46. The POLARSTREAM system employed a liquid nitrogen spray header located in the truck to which the liquid nitrogen was supplied and from which a spray of liquid nitrogen was discharged into the truck (Phillips Tr. 518).

47. Following the meeting between Macintosh, Ross, Smith, and Phillips in Toronto on October 9, 1962, Phillips drew a sketch (Phillips Sketch) dated October 11, 1962, of an experimental liquid nitrogen freezer for Mealmaster and Phillips sent a copy of the Phillips Sketch to Ross with a letter (Phillips Letter) dated October 12, 1962 (DX–K; Smith Tr. 476–77; Phillips Tr. 525–27).

48. The similarity of the Phillips Sketch and Figure 1 of the Macintosh Patent was testified to by Phillips (Tr. 546–47) and they appear to be identical in all material respects.

49. The Phillips Letter describes operation of the Experimental Freezer shown on the Phillips Sketch including the function of the exhaust fan to establish counter-current flow of cold nitrogen gas relative to the food to reduce the possibility of the food cracking by thermal shock when subjected to the liquid nitrogen spray (Phillips Tr. 527–28).

50. By a letter dated October 15, 1962 (PX–186), Ross passed on to Macintosh a sketch of an experimental freezer for Mealmaster.

51. The Ross letter dated October 15, 1962, is substantially identical in all material respects to the Phillips Letter (Phillips Tr. 535–37).

52. On November 12, 1962, J. T. Sills (Sills), then an employee of Linde Company Division, Union Carbide (USA) at the Tonawanda Laboratories, wrote a letter to Ross (DX–L) referring to the Phillips Letter and mentioning "Mr. Phillips' concept" (Sills Tr. 445–48).

53. In December 1962, Sills visited Mealmaster at Toronto, Canada, and built a liquid nitrogen freezing tunnel in accordance with the Phillips Sketch (Sills Tr. 448–54).

54. On March 13, 1963, F. A. Wilson (Wilson), a Patent Engineer at the Tonawanda Laboratories, wrote a letter (DX–R) to Phillips asking Phillips what Macintosh had contributed to the Phillips Sketch and the Phillips Letter (DX–R, page 1, question "2.").

55. On March 19, 1963, Phillips sent a letter to Wilson (DX–S) stating his Phillips' belief that Macintosh had not contributed to the basic concept (Phillips Tr. 530–32).

56. At trial, Phillips reaffirmed his opinion as expressed in his letter to Wilson (DX–S) (Phillips Tr. 532).

57. At trial, Phillips testified that he has no recollection of Macintosh contributing anything disclosed in the Phillips Sketch during the meeting of October 9, 1962 (Phillips Tr. 527).

58. A document entitled LABORATORY EVALUATION OF INVENTION (DX–M) includes a brief abstract of an invention including an elongated tunnel through which food articles are moved by a belt, spraying of liquid nitrogen on the food near the exit end of the tunnel and a blower to move the evaporated cold nitrogen gas through the tunnel in countercurrent relationship with the food (Smith Tr. 479–80).

59. Smith signed the document (DX–M) as the inventor since neither Phillips

nor Sills were then located at the Tonawanda Laboratories (Smith Tr. 478–79).

60. Smith testified that he believed the invention described in the document (DX–M) to be the contribution of Phillips, Sills and himself at the time he signed the document and he confirmed that belief at the time of his deposition (Smith Tr. 479–80).

61. Smith testified that he had no recollection of Macintosh contributing anything to the tunnel design shown on the Phillips Sketch (Smith Tr. 480–81).

62. Eugene C. Trautlein (Trautlein), a patent lawyer for Union Carbide (USA) had an assignment to prepare a patent application on a liquid nitrogen food freezer which he inspected at Mealmaster in May 1963 (Trautlein DX–U, p. 32).

63. As a result of that assignment, Trautlein prepared a patent application (DX–N) in the name of Ross as the sole inventor (Trautlein DX–U, pp. 38–9).

64. Before filing the Ross patent application (DX–N), Trautlein made an investigation and determined that Macintosh had contributed nothing to the liquid nitrogen food freezer disclosed in the Ross patent application (Trautlein DX–U, pp. 485–86).

65. Trautlein testified that, at the time he made the investigation of inventorship, he did not remember considering the Phillips Sketch and the Phillips Letter (DX–K) and that he had never seen the Phillips letter to Wilson (DX–S) or the LABORATORY EVALUATION OF INVENTION (DX–M) (Trautlein DX–U, pp. 73–77).

66. Macintosh testified at trial that he had independently conceived the subject matter disclosed in the Macintosh Patent at least by July 1962 (Macintosh Tr. 142–44).

67. In an attempt to corroborate Macintosh's testimony, plaintiffs offered in evidence a certified copy (PX–186) of the file wrapper of the Canadian Patent Office on a Macintosh application which corresponds to the Macintosh Patent (Canadian File Wrapper).

68. The Canadian File Wrapper (PX–186) includes an eight (8) page affidavit executed by Macintosh on November 16, 1967, and Exhibits A through J referred to as being a part of the Macintosh affidavit. The Canadian File Wrapper (PX–186) also includes an affidavit of Michael Ebert (Ebert), Macintosh's attorney.

69. Exhibit D of the Macintosh affidavit (Affidavit Exhibit D) consists of a very rough sketch bearing the date "17 July 1962."

70. Affidavit Exhibit D is not signed by anyone, neither by Macintosh or any witness.

71. Affidavit Exhibit D includes the legends "OUTLET", "SPROCKET WHEEL", "BAFFLE", "NITROGEN SPRAY", "TUNNEL", "FAN", "SUCTION DUCT", "BELT", and "INLET" for the purpose of identifying parts of the sketch.

72. The legends on Affidavit Exhibit D were placed thereon by Ebert at the time he prepared the Macintosh Affidavit and before it was executed by Macintosh on November 16, 1967 (Macintosh Tr. 157–58; 234–35; 239).

73. At trial, Macintosh was unable to identify and describe parts of the sketch that were not identified by descriptive legends added to the sketch by Ebert (Macintosh Tr. 235–39).

74. Macintosh gave no testimony as to when and under what circumstances the date "17 July 1962" was placed on the sketch Affidavit Exhibit D.

75. Macintosh could not remember if he drew the sketch, Affidavit Exhibit D, and placed the date on the sketch, using the same or a different writing instrument (Tr. 241).

76. The original of which Affidavit Exhibit D is purported to be a copy (with or without the legends) was not produced at trial and its absence was not satisfactorily explained (Tr. 155–56; 159; 540).

77. For the purpose of corroborating Macintosh's testimony, plaintiffs also offered in evidence a long-hand chronology

(PX–195) prepared by Macintosh (Tr. 260–61).

78. Macintosh admitted at trial that the chronology (PX–195) was prepared by him in the Fall of 1965 at Ebert's request for use in connection with the Canadian Patent Conflict (Macintosh Tr. 192–93; 195–97).

79. Macintosh testified at trial that he had prepared the chronology (PX–195) from notes he had made on his 1962 desk calendar (Tr. 192).

80. The first six (6) items on the Chronology (PX–195) describe events purported to have occurred in the year 1962.

81. Macintosh admitted that the Chronology (PX–195) includes statements on events alleged to have occurred in 1962, not recorded on his desk calendar, that were reconstructed from his memory about three (3) years after the occurrences of the purported events (Macintosh Tr. 194–96).

82. Macintosh testified that he had no idea how long he kept a desk calendar after the year expired and that he had no established policy of keeping his desk calendars for three or four years and that he "Never have kept them" (Macintosh Tr. 198).

83. Macintosh testified that his 1962 desk calendar "had a lot of particular dates in it" and that "Mr. Ebert asked me to keep it" (Tr. 198).

84. Macintosh testified that he first met Ebert in April or May 1963 (Tr. 159; 198) and Ebert's Affidavit (PX–186) fixes May 9, 1963, as the date of that meeting.

85. Macintosh gave no testimony, nor did plaintiffs attempt to obtain testimony from Macintosh, explaining why he had his 1962 desk calendar in his possession on May 9, 1963 (the day Macintosh said Ebert advised him to keep it), over four (4) months after the year 1962 ended especially when it was his policy "Never to keep" his desk calendars.

86. Macintosh testified that he did not know the present location of his 1962 desk calendar and could not say what he did with it but suggested the possibility that he could have sent it to Ebert (Tr. 199).

87. Although Ebert testified at trial, he offered no testimony, nor did plaintiffs attempt to obtain testimony from him, to corroborate Macintosh's testimony on Ebert's advice to Macintosh to keep his 1962 desk calendar or on the purported existence of the 1962 desk calendar in September 1965, nor is there any testimony by Ebert on the present location of the 1962 desk calendar.

88. There is no acceptable explanation in this record for Macintosh having available his 1962 desk calendar at the time he prepared the Chronology (PX–195) in the Fall of 1965.

89. Macintosh testified that he went to Union Carbide because he needed someone to say how to make the tunnel function. Specifically, Macintosh testified: "In other words, how we can put a header in and a valve in, these things I had no knowledge of" (Tr. 163).

90. It is obvious that the Phillips Letter and the Phillips Sketch (DX–K) do not supply the information Macintosh sought from Union Carbide. The Phillips Letter includes no discussion on the construction of the spray header and the Phillips Sketch depicts nothing but the purest diagrammatic showing of the spray header.

91. Macintosh testified that he, with the assistance of a Mr. Garrish, had built a liquid nitrogen freezing tunnel of the type shown in the Macintosh Patent in October 1962 after the meeting of October 9, 1962 with Phillips, Smith and Ross (Tr. 166).

92. There are no contemporaneous documents in evidence to support Macintosh's testimony. As found earlier, the Chronology (PX–195) was prepared by Macintosh about three (3) years later.

93. Sills testified as to what he saw when he visited Mealmaster in December 1962 and built a tunnel in accordance with the Phillips Sketch and he did not mention the liquid nitrogen freezing tun-

nel purported to have been built by Macintosh (Tr. 447–50).

94. Sills' testimony on this point is corroborated by a contemporaneous document. Union Carbide Corporation Invention Disclosure No. T–63–8, dated March 28, 1963 (PX–142), relates to the experimental freezer shown on the Phillips Sketch (Phillips Tr. 544–45).

95. The Invention Disclosure No. T–63–8 (PX–142) includes the following statement, p. 5:

> "This system, substantially as described by attached Fig. 1, was built and installed by Cara Foods principally at their expense, but with technical assistance being provided during construction and initial operation by Mr. J. T. Sills of Linde Tonawanda Development Laboratory. Initial operation of the system occurred on December 14, 1962, under Linde supervision, with the food articles being moved through the freezing tunnel by operating the conveyor belt manually."

96. It is unbelievable that Macintosh would have built a freezer before Sills' visit and kept such a freezer hidden from Sills and permit Sills to build a similar freezer.

97. The Invention Disclosure No. T–63–8 (PX–142) also corroborates the testimony of Phillips and Smith that Macintosh did not make any contribution to the freezer shown on the Phillips Sketch. The following statement appears, p. 5:

> "Apparently Mr. Macintosh or Mr. Ross did not make any specific contributions to the freezing system described herein."

98. In the Canadian conflict, in addition to the affidavit of Macintosh, affidavits of Ebert, Niels Gammeltoft and Ruth Lawrence were submitted to corroborate Macintosh's story (PX–186).

99. Attorney Ebert testified at trial but gave no testimony to corroborate Macintosh; in fact, no questions were put to Attorney Ebert on the matter.

100. Niels Gammeltoft did not appear at trial, his testimony was not offered and his absence was not explained.

101. Ruth Lawrence did not testify at trial although Macintosh admitted when testifying on deposition on March 3, 1971, that Ruth Lawrence was in Tampa, Florida, at that time (Transcript of Macintosh Deposition, p. 56; Tr. 554).

102. Phillips, Sills and Macintosh testified at trial and the Court had the opportunity to and did hear these witnesses and observe their demeanor while testifying and determine the credibility of their testimony.

103. The testimony of Macintosh is just simply unacceptable, incredible, can't be taken as worthy of belief in this case, and is not acceptable as proof of invention.

104. After hearing all of the witnesses and especially Macintosh himself, the Court is compelled to find that the conception he claimed as his was in reality merely adopted by him from information acquired from persons in the employ of Union Carbide Corporation.

*The Macintosh Patent is Anticipated under 35 U.S.C. § 102(a) and (b)*

105. British Patent No. 849,170 (British Patent) discloses an apparatus for freezing perishable foods by the use of liquid nitrogen.

106. The British Patent was published on September 21, 1960, years before the earliest date urged by Macintosh.

107. The apparatus of the British Patent includes an elongated tunnel having open ends. Food enters one open end of the tunnel (food inlet opening), is conveyed through the tunnel by a conveyor and leaves the other end of the tunnel (food outlet opening) in frozen condition (Gaumer Tr. 376–78; 381–84).

108. In the British Patent, the food is frozen by immersion in a bath of liquid nitrogen adjacent the food outlet opening of the tunnel and substantially

all of the cold nitrogen gas evolved upon freezing the food is forced to flow through the tunnel in countercurrent heat exchange relationship with the incoming food to progressively pre-cool the food (Ebert Tr. 38–9; 85–6; 89–90; 93–95).

109. The British Patent discloses a method of freezing food whose bodies are susceptible to physical injury when subjected to liquid nitrogen (Ebert Tr. 78; Gaumer Tr. 389).

110. The British Patent includes the expressed teaching that there is less danger (or no danger) of thermal shock to the food owing to the countercurrent method of cooling used (Page 2, lines 96–99; page 4, lines 73–76) (Gaumer Tr. 387–88).

111. The claims of the Macintosh Patent are method claims and, hence structural differences between the apparatus of the British Patent and the apparatus of the Macintosh Patent are of no moment on the matter of anticipation.

112. Defendants' expert witness Lee S. Gaumer, Jr. (Gaumer) is highly qualified (DX–J) and is specifically skilled in thermodynamics, heat transfer and heat exchange devices, the art to which the subject matter of the Macintosh Patent relates (Moran Tr. 289–90; Gaumer Tr. 369–71).

113. Gaumer testified that operation of the apparatus of the British Patent would satisfy each of the essential steps covered by the claims of the Macintosh Patent (Tr. 390–91).

114. Plaintiffs' expert witness Jack K. Moran (Moran) gave no testimony on the British Patent relative to the question of anticipation.

115. Moran testified that the apparatus of the British Patent if built, would be inoperable (Tr. 285–87; 301–02); however, there is no testimony in this record that that contention, if true, would in any way vitiate the clear teachings of the British Patent.

116. Ebert testified that the claims of the Macintosh Patent are limited to a specific manner of "forcing", i. e., "dy-

namically force", which did not occur in operation of the apparatus of the British Patent (Ebert Tr. 50–1; 93).

117. The claims of the Macintosh Patent use the word "forcing" without limitation (Ebert Tr. 50).

118. The specification of the Macintosh Patent does not use the word "forcing" (Ebert Tr. 92).

119. Ebert admitted at trial that, in operation of the apparatus of the British Patent, the "gas is forced" (Tr. 39).

120. At his pre-trial deposition, Ebert admitted that, in operation of the British Patent, the nitrogen gas is forced through the tunnel countercurrent to the incoming food to pre-cool the food (Tr. 89–90).

121. At his pre-trial deposition, Ebert admitted that the precooling in the Macintosh Patent and in the British Patent is effected in exactly the same way (Tr. 90).

122. Ebert admitted that the word "forcing" means a "compelling action" (Tr. 93).

123. Ebert admitted that a "compelling action" was inherently present upon operation of the apparatus of the British Patent (Tr. 93).

124. Ebert also testified that the claims of the Macintosh Patent are limited to an "open-ended" tunnel and that the British Patent does not disclose such a tunnel due to the presence of the bath of liquid nitrogen (Tr. 38–9).

125. In operation of the apparatus of the British Patent and of the Macintosh Patent, the food enters one end of the tunnel, passes through the tunnel and leaves the other end of the tunnel (Ebert Tr. 55–6; 84–5).

126. In operation of the apparatus of the British Patent and of the Macintosh Patent, cold nitrogen vapor is free to leave the tunnel through both ends of the tunnel (Ebert Tr. 82–83; Gaumer Tr. 385–86; 429).

127. The term "open-ended tunnel" was relied upon by Attorney Ebert during prosecution of the Macintosh Patent

to distinguish over a freezing apparatus as shown in Morrison Patent No. 3,048,-989 (Morrison Patent) wherein the nitrogen vapor is not exhausted to the atmosphere and discarded but is reliquefied for reuse in the system (PX–175, pp. 45–46).

128. The British Patent does not disclose an apparatus with a reliquefying system as does the Morrison Patent but, like the Macintosh Patent, exhausts the nitrogen gas to the atmosphere without any provision for its reuse (Gaumer Tr. 385–86).

129. At trial, Ebert gave a different meaning of the term "open ended tunnel" in testifying that the tunnel of the British Patent was not an open-ended tunnel because of the presence of the liquid nitrogen bath (Tr. 96–7).

130. The testimony of Ebert attempting to limit the meaning of common words used in the claims of the Macintosh Patent is unsupported by the Macintosh Patent and the File History of the Macintosh Patent (PX–175) and in fact is contrary to the Macintosh Patent, the File History of the Macintosh Patent and Ebert's own testimony (Ebert Tr. 63–4; 89–90; 94; 103–07).

131. The method steps called for by the claims of the Macintosh Patent find full and complete response in the normal operation of the apparatus disclosed in the British Patent.

*The Claims of the Macintosh Patent are Obvious in View of the Hill Patent, 35 U.S.C. § 103*

132. The Hill Patent (Figure 2) discloses an elongated tunnel provided with a conveyor for moving food through the tunnel; the food enters the inlet opening of the tunnel and leaves the outlet opening of the tunnel after passing under a spray of liquid air (Ebert Tr. 21–22).

133. The Hill Patent teaches expressly that the flow of cold air countercurrent to the food pre-cools the food before the food is sprayed with liquid air (Column 3, lines 74–75; Column 4, lines 1–3; Column 4, lines 45–49) (Ebert Tr. 22).

134. The Hill Patent expressly teaches that the precooling of the food by the cold air "decreases the length of time needed to freeze them [the food] and the quantity of liquid air used in the process" (Column 2, lines 45–51).

135. Defendants' expert witness Gaumer testified that the statement appearing in the Hill Patent (Column 2, lines 45–51) means that the time needed for freezing would be decreased because the food would be colder when it reached the liquid air spray and that less liquid air would be used because the cold gaseous air is used to cool the food before it reaches the liquid air spray (Gaumer Tr. 391–92).

136. The Patent Office held that it would be obvious to add an exhaust fan at the food inlet end of the apparatus of the Hill Patent (PX–175, pp. 104, 119).

137. Plaintiffs did not offer any evidence suggesting that the Patent Office experts were wrong.

138. Ebert testified that, even with a fan on the Hill apparatus, sufficient precooling would not be obtained without elongating the tunnel (Tr. 23).

139. As testified by defendants' expert witness Gaumer, a man skilled in the art of thermodynamics in 1960, when faced with the problem of designing an apparatus in accordance with the Hill Patent to operate with optimum efficiency, would extend the length of the tunnel between the food inlet end and the liquid air spray in a manner well known in the art (Gaumer Tr. 392–95).

*The Claims of the Macintosh Patent are Obvious in View of the Hill Patent and the Patents to Bate, Schupp, Clancey, and Carpenter, 35 U.S.C. § 103*

140. It has been known for decades prior to 1960 to use fans for the purpose of forcing cold gas in heat exchange relationship with food to effect refrigeration or freezing of the food.

141. As early as 1877, United States Patent No. 197,314 (DX–D, Tab 4) issued to J. J. Bate which discloses the use

of a fan for sucking cold gas in heat exchange relationship with food in a process for preserving meats (Gaumer Tr. 395).

142. Schupp Patent 2,460,150 (DX–D, Tab 6) discloses an apparatus for cooling chocolate in which fans are used for forcing refrigerated gas in countercurrent heat exchange with chocolate moving through an elongated tunnel (Gaumer Tr. 395–97).

143. In Figure 6 of the Schupp patent, a fan 6, located at the end of the tunnel where the warm chocolate enters, operates to suck cold gas through the tunnel countercurrent to the movement of the chocolate and to exhaust the gas to outside of the tunnel in a manner similar to the arrangement in the Macintosh Patent (Gaumer Tr. 396).

144. Clancey Patent 2,475,077 (DX–D, Tab 7) discloses an elongated tunnel through which food is conveyed from one end to the other end and a fan located outside of the tunnel is provided for forcing refrigerated gas through the tunnel in countercurrent heat exchange with the food therein (Gaumer Tr. 397–98).

145. Carpenter Patent 2,974,497 (DX–D, Tab 8) discloses an apparatus and a method for rapidly freezing food, shrimp in particular, by use of an elongated tunnel through which the food is conducted from one open end, through the tunnel and removed from the other open end (Gaumer Tr. 398–99).

146. In the Carpenter patent, a fan is provided for forcing the flow of cold gas through the tunnel in countercurrent heat exchange relationship with the food moving through the tunnel (Gaumer Tr. 399).

147. As testified by defendants' expert witness Gaumer, it would be obvious, in view of the teachings of the Bate, Schupp, Clancey, and Carpenter et al. patents, to place a suction fan at the inlet end 31 of Figure 2 of the Hill Patent (Gaumer Tr. 399–400).

148. Gaumer did not change his testimony on cross-examination and plaintiffs offered no testimony contrary to that of Gaumer.

*The Claims of the Macintosh Patent are Obvious in View of the Hill Patent and the Beike et al. Patent*

149. Beike et al. Patent 2,919,862 (DX–D, Tab 3) discloses a process for freezing plastic materials for preparation of such materials for a grinding operation (Gaumer Tr. 400).

150. The process of the Beike et al. patent includes all of the essential steps covered by the claims of the Macintosh Patent; the only difference being that the Beike et al. process relates to the freezing of plastic materials whereas the claims of the Macintosh Patent are limited to the freezing of perishables (Gaumer Tr. 400–02).

151. Specifically, the Beike et al. patent includes a fan 10 at the inlet end of a conveyor system for the specific purpose of sucking cold nitrogen gas in countercurrent heat exchange relationship with the plastic particles to be frozen for the purpose of precooling such particles (Gaumer Tr. 401).

152. As testified to by defendants' expert witness Gaumer, it would be obvious in view of the teachings of the Beike et al. patent to provide a fan at the food inlet end of the tunnel of the Hill Patent and to operate such fan to force substantially all of the cold nitrogen gas in countercurrent heat exchange relationship with the food (Gaumer Tr. 402–03).

*The Claims of the Macintosh Patent are Obvious in View of the British Patent*

153. The United States Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and in particular Case No. 37, Calmar, Inc. v. Cook Chemical Co., held that the "subject matter as a whole" under 35 U.S.C. § 103 is determined by reference to the prosecution history before the United States Patent Office.

154. In the Graham case, the United States Supreme Court held that the

"subject matter as a whole" under 35 U.S.C. § 103 is reduced to the distinguishing features clearly incorporated into the claims (383 U.S. 33–34, 86 S.Ct. 684).

155. The Board of Appeals of the United States Patent Office found that the Macintosh patent application "outlined a problem in the use of liquefied gas such as liquefied nitrogen in the freezing of food" and "that contact of a liquid nitrogen spray with certain foods causes damage if the food has not, as a preliminary, been adequately reduced in temperature" (PX–175, pp. 114–115).

156. The Board of Appeals expressly found that "The essential point is that the cold gas that does the precooling shall cool to an extent preventing the food from being damaged by the liquid nitrogen spray as brought out in the last section of the claim", i. e., clause (c) (PX–175, p. 115).

157. The Patent Office Board of Appeals found that "neither Hill nor any other reference presented for our consideration discloses the problem that appellant discloses or the degree of claimed precooling that will overcome this problem" and, on that basis, reversed the Examiner's rejection of the method claims (PX–175, p. 116).

158. The British Patent teaches that there is danger of thermal shock to food when subjected to liquid nitrogen which is the precise problem the Board of Appeals found to be disclosed by Macintosh (Ebert Tr. 78; Gaumer Tr. 387–88).

159. The British Patent teaches that the thermal shock problem may be overcome by properly pre-cooling the food before the food is subjected to liquid nitrogen which is precisely the identical solution disclosed by the Macintosh Patent (Ebert Tr. 78; Gaumer Tr. 387–88).

160. The British Patent teaches a method of obtaining the required precooling of the food which consists in forcing substantially all of the cold nitrogen gas in countercurrent heat exchange relationship with the food to progressively pre-cool the food before the food is subjected to liquid nitrogen, precisely the same as the method step disclosed by Macintosh and covered by the claims of the Macintosh Patent (Ebert Tr. 88–91; Gaumer Tr. 390).

161. The teaching which the Board of Appeals found to be covered by the claims of the Macintosh Patent and not disclosed by the Hill Patent, "the subject matter as a whole" under 35 U.S.C. § 103, is unequivocally taught by the British Patent.

### The Macintosh Patent is Unenforceable

162. Ebert is the patent lawyer who prepared and prosecuted the Macintosh patent application and obtained issuance of the Macintosh Patent (Ebert Tr. 13–15).

163. The decision of the Board of Appeals of the United States Patent Office which resulted in allowance of method claims to Macintosh is dated November 29, 1965; an amendment canceling the rejected apparatus claims is dated December 1, 1965; the Notice of Allowance of the Macintosh patent application is dated December 20, 1965; Michael Ebert submitted the issue fee to the United States Patent Office on December 28, 1965; and, the Macintosh Patent issued on March 8, 1966 (PX–175).

164. Ebert became aware of the British Patent upon receiving a letter (PX–179) dated December 8, 1965, from his New York foreign patent associate and received a copy of the British Patent from such associate by a letter (PX–180) dated December 10, 1965 (Ebert Tr. 30–31).

165. In February 1966, Ebert wrote a detailed letter (PX–181) to his associate discussing such British Patent (Ebert Tr. 32).

166. Ebert admitted that the British Patent teaches that foods may be damaged by thermal shock when frozen by liquid nitrogen (Ebert Tr. 78).

167. Ebert admitted that the British Patent disclosed a solution to the ther-

mal shock problem which consists in flowing substantially all of the evolved cold nitrogen gas in countercurrent heat exchange relation with the food to be frozen for the purpose of progressively precooling the food prior to the food coming into contact with the liquid nitrogen (Ebert Tr. 78).

168. In fact, Ebert admitted that the countercurrent flow of cold nitrogen gas through the tunnel of the British Patent is identical to the countercurrent flow of cold nitrogen gas through the tunnel of the Macintosh Patent (Ebert Tr. 82; 90).

169. At trial, Ebert took the position that the British Patent did not disclose the method covered by the claims of the Macintosh Patent; however, the Court finds that this record does not support Ebert's position. See Finding of Fact Nos. 105–131.

170. At trial, Ebert contended that he could not have brought the British Patent to the attention of the United States Patent Office without first petitioning the Commissioner of Patents to reopen prosecution of the Macintosh application (Ebert Tr. 108). However, Ebert could have brought the British Patent to the attention of the Patent Office by refiling the application (Ebert Tr. 108–09) or by merely writing a letter.

171. Ebert had an obligation to call the British Patent to the attention of the Patent Office and had an opportunity to do so but failed to meet that obligation and permitted the Macintosh Patent to issue without the Patent Office having knowledge of the British Patent. But for Ebert's failure to fulfill his uncompromising duty, the Macintosh Patent would not have issued.

*No Act by Air Products Constitutes Unfair Competition Against Plaintiffs*

172. Plaintiffs' charge of unfair competition against Air Products, Counts II and III, is bottomed on a Confidential Disclosure Agreement entered into on July 17, 1964, between Air Products and plaintiff Reliquifier.

173. The Confidential Disclosure Agreement is correctly reproduced in Paragraph 19 of the Amended Complaint.

174. The Agreement was executed in Pennsylvania (Tr. 509).

175. Insofar as this action is concerned, the alleged trade secret is what is disclosed in Patent Application Serial No. 280,781 as filed in the Patent Office on May 16, 1963; this patent application matured into the Macintosh Patent.

176. Since the subject matter disclosed in the Macintosh Patent was not original with Macintosh but was derived by Macintosh from Union Carbide (Finding of Fact Nos. 36–104), Macintosh never possessed title to any trade secret property that may have been disclosed in Patent Application Serial No. 280,781.

177. Since plaintiffs' title to any trade secret property is derived from Macintosh, plaintiffs never had title to any trade secret property that may have been disclosed in Patent Application Serial No. 280,781 at any time.

178. The Agreement expressly excludes any obligation on Air Products with respect to information disclosed in Patent Application Serial No. 280,781 which was in the public domain at the time the Agreement was executed on July 17, 1964.

179. Macintosh admitted that a freezing tunnel of the type shown in the Macintosh Patent was in commercial operation at Mealmaster in March of 1963 (Macintosh Tr. 179).

180. Moran testified that the Air Reduction freezers were manufactured by Jan-Phyl (Tr. 275–76) and that freezers including an elongated tunnel, a liquid nitrogen spray header located adjacent the food outlet end of the tunnel and a fan located adjacent the food inlet end of the tunnel for moving cold nitrogen gas countercurrent to the food were shipped out in about June of 1963 (Tr. 297).

181. Macintosh testified that Air Reduction had a freezer on the market in 1963 (Tr. 185).

182. The Agreement also excludes Air Products' obligation with respect to information known to Air Products at the time of the Agreement.

183. Air Products had knowledge prior to July 17, 1964 of information disclosed in the Patent Application Serial No. 280,781 which conceivably could be a trade secret.

184. In 1962, Air Products was in possession of a food freezer design in which a fan was used to move cold nitrogen gas in countercurrent relationship with the food (PX–74).

185. In 1962, Kelly of Air Products presented a paper (DX–H) in which he disclosed a liquid nitrogen freezer of the tunnel type having open ends and a conveyor and a liquid nitrogen spray with a fan for forcing the cold nitrogen gas countercurrent to the food (DX–F).

186. In the Kelly Disclosure (DX–F), the fan is located in the tunnel between the nitrogen spray and the food outlet end whereas, in Macintosh, the fan is located adjacent the food inlet end of the tunnel.

187. Moran testified with respect to the Kelly disclosure that it would be obvious to locate the fan adjacent the food inlet end of the tunnel (Tr. 503–07).

188. Dr. Thomas, another expert witness of plaintiffs, testified that the Kelly disclosure (DX–F) would suggest to him how to establish countercurrent flow of gas relative to the food in a tunnel type of freezer having a conveyor and a liquid nitrogen spray (Tr. 333).

189. Any difference between the Kelly disclosure (DX–F) and the disclosure in the Macintosh Patent Application Serial No. 280,781 would be obvious and not rise to the dignity of a trade secret.

190. At the time of the Agreement, July 17, 1964, no trade secret was in existence.

191. Any finding of fact entered herein which may be properly construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law.

## CONCLUSIONS OF LAW

### Count I

1. The claims of the Macintosh Patent No. 3,238,736 are anticipated by British Patent No. 849,170 and the Macintosh Patent is invalid under 35 U.S.C. § 102(a) and (b).

2. The Macintosh Patent No. 3,238,-736 is invalid under .35 U.S.C. § 102(f) since the subject matter disclosed and sought to be patented in the Macintosh Patent was not independently conceived by the named patentee Hamish K. Macintosh but was derived by him from another. Kennedy v. Hazelton, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576.

3. The claims of the Macintosh Patent No. 3,238,736 are invalid as obvious under 35 U.S.C. § 103 for the following reasons:

(a) obvious in view of Hill Patent No. 2,447,249;

(b) obvious in view of the Hill Patent No. 2,447,249 when considering the patents to Bate No. 197,-314, Schupp No. 2,460,157, Clancey No. 2,475,077, and Carpenter No. 2,974,497;

(c) obvious in view of the Hill Patent No. 2,447,249 considering the Beike et al. Patent No. 2,919,862;

(d) for the reason that "the subject matter as a whole" is taught by British Patent No. 849,170. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

4. The Macintosh Patent No. 3,238,-736 is unenforceable because the anticipating prior art British Patent No. 849,-170 was not called to the attention of the United States Patent Office. Beckman Instruments, Inc. v. Chemtronics, Inc., CA–5 (1970), 428 F.2d 555; Strong et al. v. General Electric Company, CA–5 (1970), 434 F.2d 1042.

### Counts II and III

5. Air Products has not violated or breached the Confidential Disclosure Agreement executed on July 17, 1964.

6. Plaintiffs never possessed title to any purported trade secret that was allegedly disclosed to Air Products and have no right to bring this action.

7. The Confidential Disclosure Agreement was executed in Pennsylvania and the law of Pennsylvania applies.

8. This action is dismissed because no information disclosed to Air Products by plaintiffs constituted a trade secret. Van Products Company v. General Welding and Fabricating Company et al., 419 Pa. 248, 213 A.2d 769 (1965).

9. Air Products had no obligation under the Confidential Disclosure Agreement because the purported trade secrets were embodied in apparatus used in commercial operations prior to the Agreement.

10. Air Products had no obligation under the Confidential Disclosure Agreement because the purported trade secrets were known to Air Products prior to the Agreement.